01

02

03

04

05

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

06   DANTE JAMAHL ALEXANDER,                )
                                            )
07          Petitioner,                     )       CASE NO. 2:07-cv-00722-RAJ-JLW
                                            )
08          v.                              )
                                            )
09   A. HEDGPETH, Warden,                   )       REPORT AND RECOMMENDATION
                                            )
10          Respondent.                     )
     _____    )

11

12          I.      INTRODUCTION

13          Petitioner is currently incarcerated at the Kern Valley State Prison in Delano,

14   California.  He seeks relief under 28 U.S.C. § 2254 from his 2004 jury conviction in the

15   Sacramento County Superior Court for first degree murder, attempted murder, second degree

16   robbery, and attempted robbery, with special allegations of personal use and intentional

17   discharge of a firearm causing great bodily injury.  (*See* Docket 21, Lodged Document 4 at 2;

18   Dkt. 15.)  Petitioner is currently serving a sentence of life without the possibility of parole.

19   (*See* Dkt. 21, LD 4 at 2-3.)  Respondent has filed an answer to the petition, as well as relevant

20   portions of the state court record.  (*See* Dkts. 16, 21, and 23.)  Although petitioner did not file

21   a traverse in reply to respondent's answer, the briefing is nevertheless complete and this

22   matter is ripe for review.  The Court, having thoroughly reviewed the record and briefing of

REPORT AND RECOMMENDATION - 1

01  the parties, recommends that the Court deny the amended petition and dismiss this action with

02  prejudice.

03      II.   FACTUAL AND PROCEDURAL HISTORY

04      Petitioner was convicted of murdering Cheryl Jones, and attempting to murder her

05  husband, Victor Jones, after carrying out an armed robbery of the victims in the early morning

06  hours of April 11, 2002.  (*See* Dkt. 21, LD 4 at 2.)  Petitioner's co-conspirators, Ladell

07  Brown, Johtell Frank, and Sirrano Haywood, were also charged with these offenses.  (*See id.*)

08      Victor and Cheryl first met petitioner and his co-conspirators at the Gold Rush Inn on

09  April 9, 2002.  (*See id.* at 3.)  Over the next two days, Victor purchased crack cocaine from

10  Brown on numerous occasions in exchange for money, as well as the use of the Jones' van.

11  (*See id.*)  On April 10, Brown informed Victor that his van had been stolen by someone.  (*See*

12  *id.* at 4.)  Victor did not believe Brown's story about the theft and suggested that Brown return

13  all the money Victor had paid him for cocaine.  (*See id.* at 5.)  Petitioner, Brown, and Victor

14  discussed the problem until Brown eventually gave Victor a quarter ounce of cocaine and $20.

15  (*See id.*)

16      Late that evening, petitioner came to the Jones' hotel room alone and asked Victor to

17  go to the store and buy him some liquor.  Victor told petitioner it would cost $10.  Petitioner

18  went back to his room, and then returned with $10 and his girlfriend, Johtell Frank.  Frank

19  offered to drive Victor to the store.  (*See id.*)  As the group left the hotel, Victor heard

20  Brown's girlfriend, Jaynelle Frank, tell her sister, Johtell Frank, "Did you hear what was

21  going to happen?  That's messed up."  (*Id.* at 6.)  Petitioner then told Jaynelle to "go in the

22  house."  (*Id.*)  At trial, Jaynelle Frank denied the statement attributed to her.  (*Id.*)

01        Petitioner, Victor, Cheryl, and Johtell Frank left the hotel in Frank's car.  Once they

02   were on the road, Frank began answering phone calls on her cell phone while driving.  (*See*

03   *id*. at 6.)  At one point, when Frank received a cell phone call, she told the caller, "After I

04   finish with them, I'll deliver what you need."  (*Id*.)  Evidence later introduced by the

05   prosecution at trial suggested that Frank had been speaking to Haywood while driving.

06   Specifically, a number of calls were placed between Frank's Metro PCS cell phone and a

07   particular SureWest cell phone, beginning at 10:52 p.m. on April 10, 2002, and ending at 2:42

08   a.m. on April 11, 2002.  (*See id*. at 6-7.)  The SureWest account for that phone was billed to

09   Haywood's address, and Haywood's sister testified that she had obtained a SureWest phone

10   for Haywood.  (*See id*. at 7.)

11        Although Frank's passengers attempted to give her directions to the store, Frank kept

12   turning the car in the opposite direction of their instructions.  Victor had noticed that another

13   vehicle was following them, and when that vehicle flashed its high beams, Frank accelerated

14   and turned into a cul-de-sac.  (*See id*. at 6-7.)  The other vehicle followed them.  (*See id*. at 7.)

15   Once Frank had parked the car, she immediately got out.  Petitioner then pointed a handgun at

16   Victor and said, "Give me all your shit."  (*Id*.)  Victor handed petitioner everything he had – a

17   wallet with bank cards and $12 in cash, a watch, keys to his car, and a packet of Tic Tacs.

18   (*Id*.)  Brown then walked up to the car, pointed a rifle at Victor, and directed Victor and

19   Cheryl to get out of the car.  (*See id*.)

20        Victor pushed Cheryl into the light in front of the car, and then stood back in the dark.

21   (*Id*. at 7.)  He told Brown, "Man, you don't have to do this . . . I'll go to the bank and get you

22   money."  (*Id*.)  When Victor yelled, "You're going to kill us," petitioner shot him in the left

REPORT AND RECOMMENDATION - 3

01  shoulder.  (*Id*. at 8.)  Victor made a dash for the door of one of the nearby houses and heard

02  both guns fire at him, hitting him twice in the left arm.  (*See id*. at 8.)  Victor continued to run

03  until his feet were shot out from under him, and he fell to the ground.  He remembers hearing

04  gunfire from multiple guns, and he watched Brown shoot Cheryl three or four times with his

05  rifle as she was in the process of kneeling on the ground.  Cheryl Jones died of a gunshot

06  wound to the back inflicted by a .223 rifle.  (*See id*.)

07          After Victor yelled and broke out windows in the door of a nearby house, a man's

08  voice from inside the house announced that the police were on their way.  (*See id*.)  Brown

09  attempted to shoot Victor with the handgun Victor had seen in the hands of petitioner.  After

10  the gun misfired twice, however, the co-conspirators fled.  (*See id*.)  Victor's lack of sleep and

11  use of cocaine and alcohol prior to the offenses might have impaired his ability to observe and

12  describe the events that morning.  (*See id*.)

13          Petitioner was arrested later that afternoon.  Sacramento County Sheriffs' Detectives

14  Grant Stomsvik and Will Bayles informed petitioner that he was in custody and they wished

15  to question him as part of their investigation regarding these offenses.  (*See* Dkt. 21, 5 Clerk's

16  Transcript on Appeal at 1201-02.)  When Detective Stomsvik began to inform petitioner of

17  his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), petitioner interrupted him and

18  asserted that he would not speak with the detectives until he had an attorney.  (*See id*. at

19  1208.)  The detective responded, "That's fine.  What I can do is leave you a business card . . .

20  [a]nd either you or your lawyer can contact me.  Okay.  If you want – if you change your

21  mind and you want to tell me your side of the story, I'll be glad to hear it.  Okay?"  (*Id*.)  He

22  told petitioner they would be back with him soon, but they needed to interview a few other

01  witnesses.  (*See id*. at 1209.)

02        While petitioner waited in an interview room, police performed a gunshot residue test

03  and took a few photographs of petitioner.  (*See id*. at 1215-1237.)  Although petitioner

04  repeatedly attempted to ask officers questions about the status of the case and what was

05  happening to his girlfriend, they declined to answer most of his questions.  (*See id*.)  When

06  petitioner asked Sergeant Hill if he could speed up the process by talking to the detectives

07  about the case, Sergeant Hill told him "No.  I can't say that.  I don't know.  I mean, you have

08  that right, you don't have to – talk to us." (*Id*. at 1234.)  Finally, after petitioner persisted

09  in asking questions, Sergeant Hill said,

10                    I – I would -- if I could legally, I could explain a lot of stuff to
                    you, okay.  You did something during your interview initially
11                    which prevents us from talking to you any further about the
                    case.  Okay.  You asked for an attorney. Once you do that, we
12                    can no longer talk to you about the case.  Okay? The only way
                    around that is if you solicit (sic) and change your mind or
13                    whatever and I'm not in any kind of position to address that.
                    Okay.  That will be up to the other detectives and stuff.  But
14                    since you asked for the attorney, I can't talk to you about the
                    case, Dante.

15

16  (*Id*. at 1236-37.)

17        Petitioner responded that he would "rather have the detectives come back then.  I'll

18  talk to them. Well, if I talk to them, and you know what I mean, and all this stuff come back

19  right, will I still go back – still go to jail?"  (*Id*. at 1237.)  Sergeant Hill said, "I can't tell you

20  that.  Um, you're under arrest now for the murder like they explained to you about.  What's –

21  what's happened if you talk to them, I don't know . . . And I can't ask them any questions

22  about it.  I'm trying to make that perfectly clear, you asked for an attorney and I am not in a

REPORT AND RECOMMENDATION - 5

01  position to talk to you about the case." (*Id.*)  Sergeant Hill then left the room to get petitioner

02  a Pepsi to drink.  As soon as he returned with the Pepsi, petitioner repeated his request to

03  speak with the detectives.  Petitioner explained, "I'm just trying to get this shit done possible

04  – quick."  (*Id.* at 1238.)  Sergeant Hill then agreed to tell the detectives petitioner wanted to

05  talk to them.

06          Approximately twenty-five minutes later, Detectives Stomsvik and Bayles returned to

07  the interview room where petitioner was sitting.  (*See id.* at 1238.)  Petitioner told the

08  detectives, "You can talk to me, man."  (*Id.* at 1239.)  Before questioning petitioner, Detective

09  Stomsvik asked petitioner again, "You – you notified my boss that you want to talk to me

10  now.  Do you want to talk to me now?"  Petitioner answered, "Yeah."  (*Id.* at 1239-40.)

11  Detective Stomsvik then read petitioner his *Miranda* rights.  (*See id.* at 1240.)  After being

12  fully informed of his rights, petitioner again agreed to speak with the detectives about the

13  case.  (*See id.*)

14          The detectives then interviewed petitioner for several hours in a session that was video

15  recorded.  (*See id.* at 1240-1459.)  During the interview, petitioner admitted that he had

16  helped plan the robbery of Victor and Cheryl Jones.  (*See id.* at 1422-1441.)  He later asserted,

17  however, that he had lied to the detectives throughout the interview because he did not trust

18  them and "I'm going to jail anyway. . . ."  (*Id.* at 1452; *see id.* at 1450-59.)

19          The district attorney charged petitioner, Brown, Frank, and Haywood with the crimes

20  committed against Victor and Cheryl Jones.  (*See id.*, LD 4 at 1.)  Before trial, in September

21  2003, Haywood pled guilty to voluntary manslaughter and attempted murder, and admitted he

22  was an armed principal in the shootings.  (*See id.* at 1.)  The remaining three codefendants

01    were tried in a single criminal proceeding before three separate juries.  (*See id.*)  Because

02    Haywood had not yet been sentenced at the time of the trial, when the defense called him as a

03    witness Haywood invoked the Fifth Amendment and refused to answer any questions

04    regarding the offenses.  (*See id*., 6 RT at 1281-84.)

05          In addition, petitioner moved during trial to exclude evidence of his interview with the

06    detectives.  (*Id*., 2 Reporter's Transcript on Appeal at 70-76.)  The trial court found that "there

07    is no question that Mr. Alexander clearly invoked" his right to counsel when the detectives

08    first approached him regarding the offenses.  (*Id*. at 81.)  Contrary to petitioner's contention

09    that the officers who spoke with petitioner and performed the drug residue test on him later

10    "badgered" or coerced him into waiving this right, however, the trial court found that "the

11    officers in fact bent over backwards to make it clear to Mr. Alexander that they could not talk

12    to him about what he was being held for because he had invoked his right to have a lawyer

13    present.  Over and over again Mr. Alexander keeps trying to keep the conversation going by

14    asking questions."  (*Id*.)  As a result, the trial court concluded that the portion of the

15    detectives' interview which took place after petitioner had been fully advised of his *Miranda*

16    rights would be admissible at trial.  (*See id*. at 82-83.)  Pursuant to the trial court's ruling, the

17    prosecution played an edited version of the videotaped interview for petitioner's jury at trial.

18    (*See id.*, 6 RT at 1242-50; s*ee id*., LD 4 at 9.)

19          The jury found petitioner guilty of first degree murder, attempted murder, second

20    degree robbery, and attempted robbery, and found true all the special allegations and

21    circumstances alleged in the amended information.  (*See id*. at 2.)  Specifically, the charges

22    included allegations of personal use and intentional discharge of a firearm causing great

01   bodily injury.  (*See id*.)  The trial court sentenced petitioner to a determinate term of twenty-

02   seven years, plus an indeterminate term of twenty-five-years-to-life without the possibility of

03   parole.  (*See id*. at 2-3; CT 13.)

04       Petitioner timely appealed his conviction and sentence to the California Court of

05   Appeal, which affirmed the trial court's judgment on September 21, 2005.  (*See id*. at 28.)

06   The California Supreme Court summarily denied petitioner's petition for review on

07   November 30, 2005.  (*See* Dkt. 21, LD 5 and 6.)  Petitioner did not seek habeas corpus relief

08   in the state courts.  Petitioner filed his first federal habeas petition on April 6, 2007, but

09   subsequently retained new counsel to represent him.  (*See* Dkts. 1, 4, 5, and 6.)  He filed the

10   instant amended petition and memorandum of points and authorities on February 18, 2008.

11   (*See* Dkt. 15.)

12       III.    FEDERAL CLAIMS FOR RELIEF

13       Petitioner presents the following claims for relief in his amended habeas petition:

14       1.    Petitioner expressly invoked his right to counsel and his subsequent confession
             is inadmissible because police induced dialogue through coercive and
15            deceptive methods.

16       2.    The prosecutor violated petitioner's due process rights to compulsory process
             and to present a defense by entering into an illusory plea agreement with
17            Sirrano Hayward that discouraged Haywood from testifying.

18   (*See id*. at 6 and 13.)

19       Respondent concedes that petitioner has exhausted his state court remedies as to both

20   claims for relief, but contends that his claims are without merit.  (*See* Dkt. 16 at 2.)

21

22

REPORT AND RECOMMENDATION - 8

01        IV.     STANDARD OF REVIEW

02        The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this

03   petition because it was filed after the enactment of AEDPA.  *See Lindh v. Murphy*, 521 U.S.

04   320, 326-27 (1997).  Because petitioner is in custody of the California Department of

05   Corrections pursuant to a state court judgment, 28 U.S.C. § 2254 provides the exclusive

06   vehicle for his habeas petition.  *See White v. Lambert*, 370 F.3d 1002, 1009-10 (9th Cir. 2004)

07   (providing that § 2254 is "the exclusive vehicle for a habeas petition by a state prisoner in

08   custody pursuant to a state court judgment. . . .").  Under AEDPA, a habeas petition may not

09   be granted with respect to any claim adjudicated on the merits in state court unless petitioner

10   demonstrates that the highest state court decision rejecting his petition was either "contrary to,

11   or involved an unreasonable application of, clearly established Federal law" as determined by

12   the U.S. Supreme Court, or "was based on an unreasonable determination of the facts in light

13   of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1) and (2).

14        As a threshold matter, this Court must ascertain whether relevant federal law was

15   "clearly established" at the time of the state court's decision.  To make this determination, the

16   Court may only consider the holdings, as opposed to dicta, of the U.S. Supreme Court.  *See*

17   *Williams v. Taylor*, 529 U.S. 362, 412 (2000).  In this context, Ninth Circuit precedent

18   remains persuasive but not binding authority.  *See id.* at 412-13; *Clark v. Murphy*,

19    331 F.3d 1062, 1069 (9th Cir. 2003).

20        The Court must then determine whether the state court's decision was "contrary to, or

21   involved an unreasonable application of, clearly established Federal law."  *See Lockyer v.*

22   *Andrade*, 538 U.S. 63, 71 (2003).  "Under the 'contrary to' clause, a federal habeas court may

REPORT AND RECOMMENDATION - 9

01  grant the writ if the state court arrives at a conclusion opposite to that reached by [the

02  Supreme] Court on a question of law or if the state court decides a case differently than [the]

03  Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13.

04  "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the

05  state court identifies the correct governing legal principle from [the] Court's decisions but

06  unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413.  At all

07  times, a federal habeas court must keep in mind that it "may not issue the writ simply because

08  [it] concludes in its independent judgment that the relevant state-court decision applied clearly

09  established federal law erroneously or incorrectly.  Rather that application must also be

10  [objectively] unreasonable." *Id.* at 411.

11       In each case, the petitioner has the burden of establishing that the state court decision

12  was contrary to, or involved an unreasonable application of, clearly established federal law.

13  *See* 28 U.S.C. § 2254; *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).  To determine

14  whether the petitioner has met this burden, a federal habeas court looks to the last reasoned

15  state court decision because subsequent unexplained orders upholding that judgment are

16  presumed to rest upon the same ground.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04

17  (1991); *Medley v. Runnels*, 506 F.3d 857, 862 (9th Cir. 2007).  Where, as in this case, the

18  state courts have reviewed the claims and denied them without comment, the federal court

19  conducts an independent review of the record "to determine whether the state court clearly

20  erred in its application of controlling federal law." *Delgado v. Lewis*, 223 F.3d 976, 982 (9th

21  Cir. 2000).

22

01          Finally, AEDPA requires federal courts to give considerable deference to state court

02   decisions, and state courts' factual findings are presumed correct.  *See* 28 U.S.C. § 2254(e)(1).

03   Federal courts are also bound by a state's interpretation of its own laws.  *See Murtishaw v.*

04   *Woodford*, 255 F.3d 926, 964 (9th Cir. 2001) (citing *Powell v. Ducharme,* 998 F.2d 710, 713

05   (9th Cir. 1993)).

06          V.      DISCUSSION

07          A.      *Petitioner's* Miranda *Claim*

08          Petitioner argues that his right to due process of law and a fair jury trial under the

09   Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution were violated by the trial

10   court's admission of the incriminating statements petitioner made to police during his

11   interrogation on April 11, 2002.  (*See* Dkt. 15 at 6.)  Petitioner asserts that he unambiguously

12   invoked his right to counsel, and did not voluntarily waive this right when he reinitiated

13   dialogue with police about the offenses "because police induced dialogue through coercive

14   and deceptive methods."  (*Id*.)  Petitioner also cites *Miranda* to support the proposition that

15   "[a]ny evidence that [petitioner] was threatened, tricked, or cajoled into a waiver will, of

16   course, show that [petitioner] did not voluntarily waive his privilege." (*Id*. at 10.)  *See*

17   *Miranda*, 384 U.S. at 476.  Specifically, petitioner argues that after he invoked his right to

18   counsel, police officers "incorrectly told him they could not give him information about the

19   case because he asked for an attorney . . . They also implied that an attorney could only be

20   obtained by retaining one."  (*Id*. at 10.)

21          Petitioner seems to be characterizing several of the statements Sergeant Hill made in

22   response to petitioner's persistent questions about the case as being coercive or deceptive.

01 (*See id*.)  For example, while petitioner was being photographed by police officers, he asked

02 Sergeant Hill if "I just got to sit in jail till I talk to an attorney?"  (*See* Dkt. 21, 5 CT at 1216.)

03 Sergeant Hill responded, "You can attempt to bail – well, your bail is going to be zero until

04 you go to court but yeah, you can just go ahead and try to get an attorney.  We're not picking

05 you at random but I'm – I can't go into the case of why we know what we do.  Okay?"  (*Id*.)

06 Moments later, when petitioner asked why there was no lawyer present during his gunshot

07 residue test, Sergeant Hill responded, " 'Cause we're not questioning you regarding what

08 happened . . . if we were questioning you regarding the incidents which occurred you could

09 have an attorney here.  But right now you don't have an attorney retained so it would be kind

10 of hard for us to question you regarding this – when you don't have an attorney, right?" (*Id*. at

11 1217-1218.)  Finally, after petitioner had been sitting alone in the interrogation room for

12 approximately forty minutes, petitioner asked, "So eventually I'm going to jail for murder?"

13 (*Id*. at 1232.)  Sergeant Hill responded, "Yes." (*Id*.)  When petitioner asked if he would have

14 to stay in jail "until I beat the case," Sergeant Hill explained,

15
16
17
18

> No.  You'll have an opportunity to bail out.  And again, I don't know what your bail's going to be or any of those circumstances right now.  Right now it's going to be no bail because that's the way it is until you go to court.  Once we go to court, uh, then your attorney can argue during the bail hearing that you should have some kind of a bail.  So you'll get the opportunity to get out if you can bail.  Okay.

19 (*Id*. at 1232-33.)  Petitioner then resumed asking questions about the status of his girlfriend,

20 and whether she was also going to jail after the detectives questioned her.  (*Id*. at 1233-34.)

21 　　　In *Edwards v. Arizona*, the U.S. Supreme Court set forth the bright line rule that once

22 an accused has "expressed his desire to deal with the police only through counsel, [he] is not

REPORT AND RECOMMENDATION - 12

01  subject to further interrogation by the authorities until counsel has been made available to

02  him, *unless the accused himself initiates further communication, exchanges, or conversations*

03  *with the police*." 451 U.S. 477, 484-85 (1981) (emphasis added).   In determining whether the

04  accused waived his Fifth Amendment right to have counsel present during interrogation, the

05  government must show (1) that the accused initiated further discussions with the police, and

06  (2) that "the purported waiver was knowing and intelligent and found to be so under the

07  totality of the circumstances." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983) (quoting

08  *Edwards*, 451 U.S. at 486 n.9).   *See also Smith v. Illinois*, 469 U.S. 91, 95 (1984).

09       To satisfy the first prong, the accused must initiate further communication, exchanges,

10  or conversations with the police by speaking words or engaging in conduct that can "be fairly

11  said to represent a desire on the part of the accused to open up a more generalized discussion

12  relating directly or indirectly to the investigation." *Bradshaw*, 462 U.S. at 1045.  To satisfy

13  the second prong, the waiver of *Miranda* rights must be knowing, intelligent, and voluntary.

14  *Miranda*, 384 U.S. at 479.  A waiver is "knowing" and "intelligent" if an accused understands

15  the advisements and consequences of giving up the right to an attorney, and "voluntary" if

16  there is no "evidence that the accused was threatened, tricked, or cajoled into a waiver. . . ."

17  *Id*. at 476 and 479.  Thus, "[o]nce it is determined that a suspect's decision not to rely on his

18  rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and

19  that he was aware of the State's intention to use his statements to secure a conviction, the

20  analysis is complete and the waiver is valid as a matter of law." *Moran v. Burbine*, 475 U.S.

21  412, 422-23 (1986).

22

01          Applying the relevant U.S. Supreme Court precedent discussed above, the California

02   Court of Appeal rejected petitioner's claims.  Specifically, the court reasoned as follows:

03                On appeal, defendant argues that the trial court erred in failing
                  to exclude the entire interview.  He contends that after he
04                initially invoked his right to counsel, the conduct of the sheriff's
                  deputies, which included misinforming him of the consequences
05                of asserting his rights, defeated the requirement that any post-
                  invocation waiver of *Miranda* rights be knowing and intelligent.
06                We conclude there was no error. . . .

07                Viewing the ongoing conversation between defendant and the
                  sheriff's deputies in its totality, it is clear that defendant
08                repeatedly attempted to initiate a generalized discussion about
                  the investigation, and said he would talk to the detectives before
09                directly asking Sergeant Hill to tell the detectives he was
                  willing to talk to them.  (*San Nicholas*, *supra*, 34 Cal.4th at pp.
10                642-643.)  Defendant  doggedly  sought  information  from
                  Sergeant Hill about Johtell and how long he would have to wait
11                for something to happen.  And, as defendant demonstrates,
                  Sergeant Hill doggedly refused to discuss the case with him.

12
                  Turning to defendant's specific arguments . . . the fact that
13                defendant interrupted Detective Stomsvik to invoke his right to
                  counsel before Stomsvik gave the entire *Miranda* admonition is
14                a difference without a distinction because it does not distinguish
                  this case in any material way from prior decisions finding
15                defendant's statements admissible.  Defendant's conduct simply
                  suggests that defendant understood his right to remain silent and
16                not talk with the detectives without an attorney before Stomsvik
                  recited the full admonition. . . .
17
                  Nor do we find merit in the claim that Sergeant Hill misled
18                defendant about his right to appointed counsel.  Sergeant Hill
                  correctly informed defendant that he was not entitled to have an
19                attorney present during gunshot residue tests.  An indigent
                  criminal defendant is entitled to appointed counsel "at every
20                stage of a criminal proceeding where substantial rights of a
                  criminal accused may be affected."  (*Mempa v. Rhay* (1967)
21                389 U.S. 128, 134 [19 L.ED.2d 336, 340.)  Defendant does not
                  contend the administration of a gunshot residue test was a
22                proceeding  that  affected  defendant's  substantial  rights.
                  Sergeant Hill's other statements were also correct when read in

01        context.  No attorney would have been appointed for defendant until the district attorney filed a criminal complaint and defendant appeared in court for his arraignment.  ([California Penal Code] § 987.)  Sergeant Hill did not tell defendant he could have an attorney only if he retained one.  Moreover, any possible confusion was remedied by Stomsvik when he read defendant the complete *Miranda* admonition when defendant agreed to talk.

Defendant also complains that Hill misinformed defendant that he could not discuss anything about the case once defendant invoked his right to counsel.  There is often a fine line between police answering a defendant's questions and police renewing interrogation.  (See *People v. Boyer* (1989) 48 Cal.3d 247, 273-275, overruled on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1; see also *People v. Sims* (1993) 5 Cal.4th 405, 440-444.)  In this legal context, Sergeant Hill acted prudently in declining to discuss the case with defendant.

Three other factors are worthy of consideration in assessing the "totality of the circumstances" showing that defendant, not the sheriff's deputies, initiated further communication with the detectives.  (*San Nicholas*, *supra*, 34 Cal.4th at pp. 642-643.)  First, nearly two hours passed between the time defendant invoked his right to an attorney at 5:50 p.m. and the time the detectives returned, at his request, to talk to him at 7:27 p.m.  This was ample time for defendant to evaluate his situation and to dispel the effects of what defendant characterizes on appeal as "misadvice of rights and deceptive or misleading statements."  Second, as the transcript reveals, defendant's general antagonistic attitude and lack of cooperation with deputies during this period belies any claim his will was overborne.  Third, defendant had to repeat his request to talk to the detectives twice before Sergeant Hill delivered his message.  And Sergeant Hill said it would have to wait until the officers were done with what they were doing, further indicating the detectives were not endeavoring to overcome defendant's will.  Based on the foregoing, we also conclude defendant made a knowing and intelligent waiver of his *Miranda* rights.

(Dkt. 21, LD 4 at 9 and 16-19.)

REPORT AND RECOMMENDATION - 15

01        Here, the California Court of Appeal applied the appropriate federal standard in

02  evaluating petitioner's claim, and reasonably concluded that petitioner's constitutional rights

03  were not violated by the trial court's admission of the portion of the interrogation that took

04  place after petitioner had been fully advised of his *Miranda* rights and nevertheless agreed to

05  discuss the case with the detectives.  Although petitioner clearly and unambiguously invoked

06  his right to counsel when the detectives first approached him to discuss the case, petitioner

07  subsequently "initiated further communication, exchanges, or conversations with police."  *See*

08  *Edwards*, 451 U.S. at 484-85.  Specifically, petitioner's questioning of Sergeant Hill about the

09  status of his case, as well as the status of his girlfriend, may have been "fairly said to

10  represent a desire on the part of the accused to open up a more generalized discussion relating

11  directly or indirectly to the investigation."  *Bradshaw*, 462 U.S. at 1045.  In any event,

12  petitioner's multiple requests for Sergeant Hill to inform the detectives that he had changed

13  his mind and wished to talk to them to "speed up" the process constituted an initiation of

14  further communication or conversation with police relating to the investigation.

15        In addition, the record demonstrates that the California Court of Appeal's finding that

16  under the totality of the circumstances, petitioner's waiver of his *Miranda* rights was

17  voluntary, knowing, and intelligent, was not an unreasonable application of clearly

18  established federal law.  *See Bradshaw*, 462 U.S. at 1045.  Contrary to petitioner's

19  contentions, Sergeant Hill's statements to petitioner, viewed in context, did not induce

20  dialogue by petitioner through coercive and deceptive methods.  (*See* Dkt. 1 at 10.)  On the

21  contrary, Sergeant Hill repeatedly advised petitioner that he could not discuss the case

22  because petitioner did not yet have an attorney present, and there is no evidence that petitioner

01  "was threatened, tricked, or cajoled" into waiving his right to counsel.  *See Miranda*, 384 U.S.

02  at 476.  Furthermore, before detectives began to question petitioner about the case, they fully

03  advised petitioner of his *Miranda* rights.  (*See* Dkt. 21, 5 CT at 1240.)  Petitioner then agreed

04  to speak with the detectives about the case without any impropriety on the part of police.  *(See*

05  *id*.)  As a result, petitioner's subsequent statements to the detective during the interrogation

06  were the result of a voluntary and knowing waiver of his rights.  *See Bradshaw*, 462 U.S. at

07  1046.

08      Accordingly, petitioner has failed to establish that the California Court of Appeal's

09  denial of petitioner's claim was contrary to, or an unreasonable application of, clearly

10  established federal law as determined by the U.S. Supreme Court.  I therefore recommend that

11  petitioner's request for habeas relief based upon this claim be denied.

12      B.      *Petitioner's Prosecutorial Misconduct Claim*

13      Petitioner contends that "the prosecutor violated petitioner's due process rights to

14  compulsory process and to present a defense by entering into an illusory plea agreement with

15  Sirrano Haywood that discouraged Haywood from testifying" by improperly inducing him to

16  invoke his Fifth Amendment privilege when he was called as a defense witness.  (Dkt. 15 at

17  13.)  Specifically, petitioner contends that the prosecutor committed misconduct when she

18  failed to consummate Haywood's plea bargain so that he could be sentenced prior to

19  petitioner's trial.  (*See id*. at 13-15.)  Petitioner argues that, if Haywood had been sentenced

20  prior to petitioner's trial, Haywood might have testified in a manner incriminating himself and

21  exonerating petitioner.  (*See id*.)  In addition, petitioner contends that the prosecutor

22  committed misconduct when she conditioned Haywood's plea bargain upon Haywood

01     refraining from providing any information about his role in the offenses that was inconsistent

02     with his prior statements to authorities.  (*See id*.)  Petitioner claims this misconduct caused

03     Haywood to invoke the Fifth Amendment when called to testify as a defense witness, which

04     "stripped the Petitioner of his Constitutional rights under the Sixth and Fourteenth

05     Amendments to have a 'meaningful opportunity to present a defense'" under *Crane v.*

06     *Kentucky*, 476 U.S. 683, 690 (1986).  (*Id*. at 15.)

07         Petitioner's claim involves the interplay between a witness' Fifth Amendment privilege

08     against self-incrimination, a defendant's Sixth Amendment right to present a defense and

09     compel testimony, and the doctrine of prosecutorial misconduct.  The Fifth Amendment

10     privilege against self-incrimination applies to evidence which may directly support a criminal

11     conviction, information which would furnish a link in the chain of evidence that could lead to

12     a prosecution, and evidence which an individual reasonably believes could be used against

13     him in a criminal prosecution.  *Maness v. Meyers*, 419 U.S. 449, 461 (1975).  Significantly, a

14     convicted but unsentenced defendant retains his Fifth Amendment rights.  *United States v.*

15     *Paris*, 827 F.2d 395, 399 (9th Cir. 1987).

16         With respect to the Sixth Amendment, the U.S. Supreme Court has stated that "[t]he

17     right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in

18     plain terms the right to present a defense . . . . This right is a fundamental element of due

19     process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).  This right, however, is not

20     absolute, and may bow to accommodate other legitimate interests in the criminal trial process

21     in appropriate cases. *See Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).  More than the

22     mere absence of testimony is necessary to establish a violation of the Sixth Amendment right

01  to compulsory process.  *United States v. Valenzuela-Bernal,* 458 U.S. 858, 867 (1982).

02  Furthermore, a criminal defendant's Sixth Amendment rights, including the right to

03  compulsory process, do not necessarily include the right to compel a witness to waive the

04  Fifth Amendment privilege against self-incrimination.  *See Kastigar v. United States*, 406

05  U.S. 441, 444-45 (1972); *United States v. Vavages*, 151 F.3d 1185, 1191-92 (9th Cir. 1998);

06  *United States v. Straub*, 538 F.3d 1147, 1166 (9th Cir. 2008) (no Fifth Amendment right for

07  defendant to demand "use immunity" for a co-defendant; courts must be "extremely hesitant"

08  to intrude on the Executive's discretion to decide whom to prosecute).  Similarly, an accused

09  is generally not entitled to compel a prosecutor to grant immunity to a potential defense

10  witness to get the witness to testify.  *See United States v. Paris*, 827 F.2d 395, 399 (9th Cir.

11  1987); *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978).

12         In considering "prosecutorial misconduct," the U.S. Supreme Court has stated that

13  prosecutors must "refrain from improper methods calculated to produce a wrongful

14  conviction."  *Berger v. United States*, 295 U.S. 78, 88 (1935).  The Supreme Court has also

15  held that the appropriate standard of review for prosecutorial misconduct is "the narrow one

16  of due process," because a defendant's due process rights are violated when a prosecutor's

17  misconduct renders a trial "fundamentally unfair."  *Darden v. Wainwrigh*t, 477 U.S. 168, 181

18  (1986).  *See also Greer v. Miller*, 483 U.S. 756, 765 (1987); *Donnelly v. DeChristoforo*, 416

19  U.S. 637, 642 (1974).

20         In *Webb v. Texas*, the U.S. Supreme Court held that if a trial court unduly interferes

21  with a defense witness' choice whether to testify, the trial court's conduct may amount to a

22  due process violation.  409 U.S. 95, 97-98 (1972) (defense witness influenced not to testify by

01  intimidating remarks of trial judge).  Although the Supreme Court has not yet considered

02  whether similar interference by a prosecutor would violate a defendant's due process rights,

03  the Ninth Circuit has extended the rule of *Webb* to encompass the conduct of prosecutors as

04  well.  *See Earp v. Ornoski*, 431 F.3d 1158, 1167-68 (9th Cir. 2005) (prosecutor's intimidating

05  threats to prevent witness from testifying may amount to misconduct; case remanded for

06  evidentiary hearing); *United States v. Vavages*, 151 F.3d 1185, 1189-90 (9th Cir. 1998)

07  (holding that a prosecutor's conduct is also governed by *Webb*, and asserting that "a

08  defendant's constitutional rights are implicated only where the prosecutor or trial judge

09  employs coercive or intimidating language or tactics that substantially interfere with a defense

10  witness' decision whether to testify.").

11      Thus, in the absence of more specific guidance by the U.S. Supreme Court, the relevant

12  inquiry for this Court is whether (1) the prosecutor committed misconduct which (2) rendered

13  the trial so "fundamentally unfair" as to make the resulting conviction a denial of due process.

14  *See Wainwright*, 477 U.S. at 181; *Jeffers v. Ricketts*, 832 F.2d 476, 479-80 (9th Cir. 1987)

15  (where defendant has failed to provide evidence of prosecutorial misconduct, he has failed to

16  show that he was denied a fair trial), *overruled on other grounds in Lewis v. Jeffers,* 497 U.S.

17  764 (1990).  *See also Karis v. Calderon,* 283 F.3d 1117, 1128 (9th Cir. 2002) (claim of

18  prosecutorial misconduct is analyzed under prejudice standard set forth in *Brecht v.*

19  *Abrahamson*, 507 U.S. 619, 638 n. 9 (1993), regardless of type of harmless error review

20  conducted by the state courts); *Woods v. Adams*, 631 F. Supp. 2d 1261, 1279 (C.D. Cal. 2009)

21  (applying a two-part inquiry to prosecutorial misconduct claim, and finding that a prosecutor

22  who refused to prevent a witness from invoking their Fifth Amendment privilege by

01  consummating the witness' plea bargain before trial so the witness could be called to testify

02  by the defense did not commit prosecutorial misconduct rendering the trial "fundamentally

03  unfair.").

04       At trial, counsel for petitioner and codefendant Frank argued to the trial court that the

05  prosecutor's plea agreement with Haywood was "inherently coercive" because they "want[ed]

06  to be able to call [Haywood] as a witness and not have him take the Fifth Amendment."  (Dkt.

07  21, 2 RT at 130 and 134.)  In response, the prosecutor acknowledged that Haywood's plea

08  agreement "was based upon the information and evidence the People had against Mr.

09  Haywood at the time the plea was entered.  Should the people receive other evidence or

10  information from Mr. Haywood that implicates him further in this crime, the plea would be

11  withdrawn."  (*Id*. at 132.)  In other words, "[i]f Mr. Haywood wants to come in here and say

12  he is the one that shot Victor and Cheryl Jones, which is not what we had at the time of the

13  plea, the plea will be withdrawn."  (*Id*. at 135.)  She also noted, however, that Haywood "was

14  interviewed numerous times by law enforcement in this case, all on videotape . . . [b]ut he

15  never once said anything that would do anything except incriminate the three [codefendants]."

16  (*Id*. at 130.)  "He never made any type of admissions or confessions to anything except that he

17  was the driver of the second car and that he was unaware and had not been told why they were

18  going out or following the car that was in front of them, that he – his statement was he was

19  simply called over [and] . . . [w]hen he got there, Mr. Brown said, 'Hey, I want a ride.  Take

20  me somewhere,' and they ended up going to where the shooting occurred."  (*Id*.)

21       The trial court ultimately agreed with the prosecutor.  When Haywood was later called

22  as a defense witness at a hearing held outside the presence of the juries, he exercised his Fifth

01   Amendment privilege to remain silent.  (*See id.*, 6 RT at 1281-84.)

02       As a threshold matter, this Court notes that petitioner has failed to make any showing

03   or proffer as to what Haywood would have said if he had not invoked the Fifth Amendment at

04   trial.  As discussed above, there is no indication in the record that Haywood would have made

05   any self-incriminating statements, or that he would have made any statements that would have

06   helped exculpate petitioner.  On the contrary, if Haywood had testified consistent with his

07   previous statements to law enforcement, his testimony would have been detrimental to

08   petitioner's case.  As the California Court of Appeal observed, in applying the relevant state

09   court precedent to petitioner's claim, "there is nothing in this record to show that . . . the

10   structure of the plea agreement was a substantial cause in Haywood's refusal to testify, or that

11   Haywood could provide any evidence material to the defendant's defense."  (*Id.*, LD 4 at 20-

12   26.)  Without more, petitioner's speculation that Haywood's testimony would have benefited

13   his case is insufficient to entitle him to habeas relief.  *See Jones v. Gomez*, 66 F.3d 199, 204-

14   05 (9th Cir. 1995) (conclusory allegations are insufficient to support a claim for habeas

15   relief).

16       With respect to the first prong of this Court's analysis, there is no "clearly established

17   Federal law" holding that the prosecutor's refusal to consummate Haywood's plea bargain

18   before trial in this case constituted misconduct.  *See Woods*, 631 F. Supp. 2d at 1279-80 (C.D.

19   Cal. 2009) (acknowledging the absence of clearly established federal law on this precise

20   issue).  Similarly, there is no "clearly established Federal law" that holds that the prosecutor's

21   refusal to grant Haywood immunity from prosecution so that he was unable to invoke his

22   Fifth Amendment rights when called as a witness at trial constitutes misconduct.  As

01  discussed above, federal courts that have considered this issue have found that "[t]he Sixth

02  Amendment right of an accused to compulsory process to secure the attendance of a witness

03  does not include the right to compel the witness to waive his Fifth Amendment privilege.  Nor

04  is an accused entitled to compel a prosecutor to grant immunity to a potential defense witness

05  to get him to testify."  *Paris*, 827 F.2d at 399.  *See also Ricketts*, 832 F.2d at 479-80 (holding

06  that where there is no evidence the prosecutor refused to grant immunity to a defense witness

07  in order to distort the judicial fact-finding process, there was no prosecutorial misconduct);

08  *Davis v. Straub*, 430 F.3d 281, 287-88 (6th Cir. 2005) (providing that state courts necessarily

09  could not have acted contrary to clearly established Supreme Court precedent in this context,

10  because the U.S. Supreme Court has not resolved the conflict between a witness' Fifth

11  Amendment privilege and a defendant's right to present his defense.)

12          Furthermore, the fact that Haywood's plea bargain could have been revoked in the

13  event that Haywood provided information or testimony that further implicated him in the

14  offenses does not represent undue coercion, threat, or intimidation by the prosecutor.  *See*

15  *Woods*, 631 F. Supp. 2d at 1279 (providing that where a witness' plea agreement was

16  conditioned upon that witness testifying truthfully, which would be "assumedly in conformity

17  with prior statements [the witness] had made to police and authorities, as a result of which the

18  prosecutor proffered the plea bargain in the first place, such a 'condition' does not represent

19  undue coercion, threat, or intimidation.").  In contrast to cases where the prosecutor directly

20  coerced, threatened, or intimidated a witness into refusing to testify or invoking his Fifth

21  Amendment privilege, petitioner does not allege that the prosecutor threatened Haywood with

22  a perjury prosecution if he testified for the defense, or granted immunity to prosecution

01  witnesses while withholding immunity from Haywood.  *See Williams v. Woodford*, 384 F.3d

02  567, 599 (9th Cir. 2004); *Ricketts*, 832 F.2d at 479-80.  Haywood's plea agreement did not

03  prohibit him from testifying as a defense witness at trial.  (*See* Dkt. 21, 2 RT at 132-33.)  As

04  the prosecutor explained to the trial court, she had no objection to Haywood testifying for the

05  defense, as long as the plea bargain could be revoked in the event that Haywood personally

06  admitted shooting the victims.  (*See id*. at 135.)  Indeed, in the absence of such a condition, a

07  defense witness may falsely attempt to "take the heat" for the offenses after receiving the

08  benefit of his plea agreement.

09          Accordingly, petitioner has failed to show that the prosecutor's actions with respect to

10  Haywood's plea agreement constituted misconduct.  As discussed above, petitioner has also

11  failed to make any showing or proffer to demonstrate that his trial was so "fundamentally

12  unfair" as to make the resulting conviction a denial of due process.  *See Wainwright*, 477 U.S.

13  at 181; *Jeffers v. Ricketts*, 832 F.2d 476, 479-80 (9th Cir. 1987).  The California Court of

14  Appeal's denial of petitioner's prosecutorial misconduct claim was therefore not contrary to

15  clearly established U.S. Supreme Court precedent.  Petitioner's request for habeas relief based

16  upon this claim should be denied.

17          VI.      CERTIFICATE OF APPEALABILITY

18          The federal rules governing habeas cases brought by state prisoners have recently been

19  amended to require a district court that denies a habeas petition to grant or deny a certificate

20  of appealability in the ruling.  *See* Rule 11(a), Rules Governing § 2254 Cases, 28 U.S.C.

21  § 2254 (effective December 1, 2009).

22

REPORT AND RECOMMENDATION - 24

01     A petitioner seeking post-conviction relief under § 2254 may appeal a district court's

02 dismissal of his federal habeas petition only after obtaining a certificate of appealability from

03 a district or circuit judge.  A judge shall grant a certificate of appealability only where a

04 petitioner has made "a substantial showing of the denial of a constitutional right."  *See* 28

05 U.S.C. § 2253(c)(3).  The certificate must indicate which issues satisfy this standard.  *See id.*

06 § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the

07 showing required to satisfy § 2253(c) is straightforward: the petitioner must demonstrate that

08 reasonable jurists would find the district court's assessment of the constitutional claims

09 debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 474 (2000).

10     For the reasons set out in the discussion of the merits, above, jurists of reason would

11 not find the result debatable.  Accordingly, I recommend that the Court decline to issue a

12 certificate of appealability.  Petitioner is advised that, if this Court denies a certificate of

13 appealability, he may not appeal that denial in this Court. Rather, he may seek a certificate

14 from the Ninth Circuit Court of Appeals under Rule 22 of the Federal Rules of Appellate

15 Procedure.

16     VII.    CONCLUSION

17     For all of these reasons, I recommend the Court find that the state courts' decisions

18 denying petitioner's claims were not contrary to, or an unreasonable application of, clearly

19 established federal law, or based on an unreasonable determination of facts.  I further

20 recommend that the Court decline to issue a certificate of appealability and enter an Order

21 approving and adopting this Report and Recommendation, denying the amended petition

22 (Dkt. 15), and directing that judgment be entered dismissing this action with prejudice.

01        This Report and Recommendation is submitted to the United States District Judge

02   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen (14)

03   days of being served with this Report and Recommendation, any party may file written

04   objections with this Court and serve a copy on all parties.  Such a document should be

05   captioned "Objections to Magistrate Judge's Report and Recommendation."  Either party may

06   then respond to the other party's objections within fourteen (14) days of being served a copy

07   of such written objections.  Failure to file objections within the specified time may waive the

08   right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  A

09   proposed order accompanies this Report and Recommendation.

10        DATED this 7th day of May, 2010.

11

12

13                                         _____

14                                         JOHN L. WEINBERG
                                           United States Magistrate Judge

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION - 26